# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
No. 15-1013V
**Filed: April 26, 2018**
(Not to be published)

```
* * * * * * * * * * * * * * * * * * * * * * * *
                                    *
LYNSIE KAMPPI,                      *
                                    *
        Petitioner,                 *     Findings of Fact; Onset;
                                    *     Guillain-Barré Syndrome
    v.                              *     ("GBS").
                                    *
SECRETARY OF HEALTH                 *
AND HUMAN SERVICES,                 *
                                    *
        Respondent.                 *
                                    *
* * * * * * * * * * * * * * * * * * * * * * * *
```

*Braden A. Blumenstiel, Blumenstiel Falvo, LLP, Dublin, OH, for Petitioner.*
*Linda S. Renzi and Jay M. All, U.S. Department of Justice, Washington, DC, for Respondent.*

## RULING ON ONSET[1]

**Oler**, Special Master:

On September 14, 2015, Lynsie R. Kamppi ("Mrs. Kamppi" or "Petitioner") filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. § 300aa-10, *et seq*.[2] (the "Vaccine Act" or "Program"). The petition alleges that the influenza ("flu") vaccination Mrs. Kamppi received on September 28, 2013 caused her to suffer from Guillain-Barré syndrome ("GBS"). Petition at 1.

During the pendency of this matter, the Petitioner submitted two affidavits that she authored, along with affidavits prepared by her mother, her husband, and two co-workers as well

---

[1] Because this unpublished ruling contains a reasoned explanation for the action in this case, I intend to post it on the United States Court of Federal Claims' website, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). In accordance with Vaccine Rule 18(b), the parties have 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all "§" references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

as work attendance records.  The facts Petitioner presented in her affidavits relating to the onset of her medical symptoms differed from those documented in Petitioner's medical records.  When discrepancies exist between medical records and affidavits, "Vaccine Rules 3(b) and 8(c), and the principles of fairness that underlie them, counsel in favor of holding an evidentiary hearing."  *Campbell v. Sec'y of Health & Human Servs.*, 69 Fed. Cl. 775, 779-80 (2006).

Accordingly, I held a hearing on March 23, 2018, by video teleconference ("VTC") in Washington, D.C., to determine the date of onset of Mrs. Kamppi's GBS.  Mr. Braden Blumenstiel appeared, via VTC, on behalf of Petitioner and Ms. Linda Renzi and Mr. Jay All appeared, in person, on behalf of Respondent.  I heard testimony via VTC from Ms. Terry Newman, Ms. Donna Wehrman, Ms. Holly Shaw, Mr. Matt Kamppi, and Petitioner.

After carefully considering the testimony of the witnesses, the medical records, affidavits, and documentary evidence, I find that the contemporaneous medical records and histories provided by Petitioner to her medical providers more accurately reflect the onset of her GBS symptoms than the affidavits and other evidence submitted on her behalf.  Specific factual findings are set forth in detail below.  In summary, I find that Petitioner displayed symptoms of GBS beginning on January 15, 2014.

## I. Procedural History

On September 14, 2015, Petitioner filed a petition alleging that she suffered from GBS as a result of a flu vaccine administered on September 28, 2013.  Petition, ECF No. 1.  Petitioner filed medical records on October 2, 2015 and February 26, 2016.  ECF Nos. 8, 12.

On April 12, 2016, Respondent filed a Rule 4(c) Report.  ECF No. 17.  Respondent stated that "[P]etitioner has not provided evidence that satisfies her burden of proof under *Althen*[,]" and that "[P]etitioner has not shown a proximate temporal relationship between the vaccine and the onset of her GBS."  *Id.* at 5-6.  Respondent argued that Petitioner's onset occurred fifteen weeks after her flu vaccine, and "Petitioner must demonstrate that [fifteen weeks] is a medical[ly] reasonable time-frame to infer causation."  *Id.* at 6.  Respondent concluded that "[P]etitioner has failed to demonstrate entitlement to compensation and her petition for compensation should be dismissed."  *Id.*

Special Master Hastings, the former special master assigned to this case, issued an order on April 12, 2016, instructing the parties to discuss the possibility of settlement and instructing Respondent to file a status report regarding such discussion.  ECF No. 18.  In compliance with said order, Respondent filed a status report on May 26, 2016, notifying Special Master Hastings that settlement discussions were not appropriate at that time.  ECF No. 20.  The same day, Petitioner filed a motion requesting time to retain an expert in light of the issues Respondent raised in his Rule 4(c) Report.  ECF No. 21.  Petitioner's motion was granted on May 26, 2016.  ECF No. 22.

On August 4, 2016, Petitioner requested additional time to file an expert report and to obtain additional documents, such as documents from Petitioner's employer, "which could help

2

establish the onset of Petitioner's symptoms." ECF No. 26 at 1. Special Master Hastings granted Petitioner's request. ECF No. 27.

On September 20, 2016, Petitioner filed affidavits signed by Terry Newman and Matt Kamppi. Exhibits ("Exs.") 10, 11. Petitioner also filed a motion requesting additional time to "obtain and submit documents demonstrating the onset of [Petitioner's] symptoms began in October 2013 as opposed to January 2014, when [Petitioner] was first hospitalized." ECF No. 31 at 1. In said motion, Petitioner also explained her efforts to obtain records from her employer, "however [her] prior employer has failed to provide complete and accurate records to date. Consequently, [she] continues to seek relevant employment-related documents to support her claim that her symptoms began in October 2013, as opposed to January 2014." *Id.* at 1-2. Further, Petitioner was attempting to gather records from her massage therapy treatments. *Id.* at 2. Petitioner mentioned the parties agreed "that clarifying the onset of Petitioner's symptomatology is the most pertinent and pressing issue .… Evidence more clearly demonstrating the precise onset of symptomatology [would] impact the potential need for expert opinions in this case." *Id.* Petitioner's motion was granted. ECF No. 32.

On October 12, 2016 and November 1, 2016, Petitioner filed affidavits signed by Donna Wehrman and Holly Shaw, respectively. Exs. 12, 13. Petitioner filed her supplemental affidavit on November 11, 2016. Ex. 14.

On November 29, 2016, Petitioner filed a motion for an extension of time to file additional documents in order to demonstrate that "onset of Petitioner's symptoms began in October 2013 as opposed to January 2014 …." ECF No. 36 at 1. Petitioner further stated that her counsel contacted Respondent's counsel "to discuss the possibility of having a hearing regarding the onset of [P]etitioner's symptoms" and that "parties agreed that additional evidence from [P]etitioner's employer could help narrow down the date of onset." *Id.* Petitioner also noted her continued efforts to obtain records from her massage therapy treatments. *Id.* Petitioner's motion was granted on December 1, 2016, extending the deadline for Petitioner to file additional documentation and an expert report. ECF No. 37.

Petitioner requested a status conference on February 14, 2017 to discuss the onset issue. ECF No. 38. Special Master Hastings denied Petitioner's request, stating that Petitioner may request a status conference once additional records were filed. ECF No. 39. Additional records were filed on February 15, 2017 (ECF No. 40), and Petitioner motioned for either an onset hearing or status report, as well as for an extension of time to file an expert report. ECF No. 41. Special Master Hastings extended Petitioner's deadline to file an expert report and granted her motion for a status conference. ECF No. 42.

The parties appeared for a telephonic status conference before Special Master Hastings on March 22, 2017. ECF No. 43. Special Master Hastings informed the parties of his retirement, and explained that scheduling further proceedings in this case was not appropriate until a new special master was appointed. *Id.* Scheduling an onset hearing was also discussed, and Special Master Hastings noted that "based on [his] review of the relevant medical records, it appear[ed] that there [was] no support in those records for Petitioner's allegations concerning the time of onset of Petitioner's injury." *Id.* at 1. Special Master Hastings "advised counsel that, in

3

such circumstances, it may be difficult for the new special master to find that there existed a reasonable basis to proceed with this case." *Id.*

On May 18, 2017, Petitioner filed a status report and motion for date of onset hearing. ECF No. 45. Petitioner noted that "she has submitted all available relevant evidence[, and that she] believes a hearing on the onset of symptoms is appropriate." *Id.* at 3. Special Master Hastings denied Petitioner's motion as "scheduling of further proceedings in this case must await the appointment of the special master who will succeed [him] …." ECF No. 46 at 1.

This case was reassigned to Special Master Corcoran on October 5, 2017. ECF No. 48. This case was subsequently reassigned to me on December 5, 2017. ECF No. 50.

I held a status conference on December 21, 2017 to discuss the next steps in this case. ECF No. 51. During the status conference, Respondent noted that a factual hearing was not necessary, and questioned reasonable basis in this case. *Id.* Petitioner's counsel emphasized that the affidavits support Petitioner's alleged date of onset and further suggested that Petitioner and her witnesses be afforded the opportunity to testify at the hearing so that I can consider their credibility. *Id.*

I held a fact hearing on March 23, 2018 in Washington, DC. The matter is now ripe for adjudication.

## II. Legal Standards Regarding Fact Finding

Petitioners bear the burden of establishing their claims by a preponderance of the evidence. 42 U.S.C. § 300aa-13(1)(a). A petitioner must offer evidence that leads the "trier of fact to believe that the existence of a fact is more probable than its nonexistence before [he or she] may find in favor of the party who has the burden to persuade the judge of the fact's existence." *Moberly v. Sec'y of Health & Human Servs.*, 592 F.3d 1315, 1322 n.2 (Fed. Cir. 2010) (citations omitted).

In order to make a determination concerning factual issues, such as the timing of onset of petitioner's alleged injury, the special master should first look to the medical records. "Medical records, in general, warrant consideration as trustworthy evidence. The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium." *Cucuras v. Sec'y of Health & Human Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993); *Lowrie v. Sec'y of Health & Human Servs.*, No. 03-1585V, 2006 WL 3734216, at *8 (Fed. Cl. Spec. Mstr. Nov. 29, 2006). Medical records created contemporaneously with the events they describe are presumed to be accurate and complete. *Doe/70 v. Sec'y of Health & Human Servs.,* 95 Fed. Cl. 598, 608 (2010).

Contemporaneous medical records generally merit greater evidentiary weight than oral testimony; this is particularly true where such testimony conflicts with the record evidence. *Cucuras*, 993 F.2d at 1528; *see also Murphy v. Sec'y of Health & Human Servs.*, 23 Cl. Ct. 726, 733 (1991), *aff'd*, 968 F.2d 1226 (Fed. Cir.)(citing *United States v. United States Gypsum Co.*,

4

333 U.S. 364, 396 (1947) ("[i]t has generally been held that oral testimony which is in conflict with contemporaneous documents is entitled to little evidentiary weight")). "Written documentation recorded by a disinterested person at or soon after the event at issue is generally more reliable than the recollection of a party to a lawsuit many years later." *Reusser v. Sec'y of Health & Human Servs.*, 28 Fed. Cl. 516, 523 (1993).

However, there are situations in which compelling oral testimony may be more persuasive than written records--for instance in cases where records are found to be incomplete or inaccurate. *Campbell*, 69 Fed. Cl. at 779 ("like any norm based upon common sense and experience, this rule should not be treated as an absolute and must yield where the factual predicates for its application are weak or lacking"); *Lowrie*, 2005 WL 6117475, at *19 ("[w]ritten records which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent") (quoting *Murphy*, 23 Cl. Ct. at 733).

When witness testimony is used to overcome the presumption of accuracy afforded to contemporaneous medical records, such testimony must be "consistent, clear, cogent, and compelling." *Sanchez v. Sec'y of Health & Human Servs.*, No. 11-685V, 2013 WL 1880825, at *4 (Fed. Cl. Spec. Mstr. April 10, 2013)(citing *Blutstein v. Sec'y of Health & Human Servs.*, No. 90-2808V, 1998 WL 408611, at *85 (Fed. Cl. Spec. Mstr. June 30, 1998)). In determining the accuracy and completeness of medical records, the Court of Federal Claims has listed four possible explanations for inconsistencies between contemporaneously created medical records and later testimony: (1) a person's failure to recount to the medical professional everything that happened during the relevant time period; (2) the medical professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did not exist. *La Londe v. Sec'y of Health & Human Servs.*, 110 Fed. Cl. 184, 203-204 (2013), *aff'd*, 746 F.3d 1334 (Fed. Cir. 2014). A special master making a determination whether to afford greater weight to contemporaneous medical records or other evidence, such as testimony at a hearing must have evidence suggesting the decision was a rational determination. *Burns by Burns v. Sec'y of Health & Human Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993).

### III. The Petition, Affidavits, and Documentary Evidence

The Petition filed in this matter states that within a few weeks of receiving the flu vaccine on September 28, 2013, Petitioner began experiencing left and right calf pain, weakness, numbness, and tingling in her left and right lower extremities, and numbness and tingling in her upper extremities. She eventually developed paraplegia and required emergency medical treatment. Petition at 2-3.

A. **Affidavits**

1. **First Affidavit of Mrs. Kamppi**

In support of her Petition, Mrs. Kamppi signed her first affidavit on July 14, 2015. In it, she describes symptoms that developed within a few weeks after she received her flu vaccine on

September 28, 2013. These symptoms included: sharp pain in her left calf with tingling radiating into her hip; numbness and tingling in her left leg; weakness in her left leg; numbness and tingling in her right leg; pain in her right calf; weakness in her right leg; numbness and tingling in her upper extremities; and temporary paraplegia. Ex. 1 at 1.

In mid-January, 2014, Petitioner began to experience pain in her left calf, which eventually developed into numbness and tingling in her left leg. *Id.* The pain, numbness, and tingling developed in her right calf and leg. Ultimately, she lost all feeling below her waist.

### 2. Second Affidavit of Mrs. Kamppi

On November 11, 2016, Petitioner signed her second affidavit. In this document, she reiterates the symptoms of numbness, tingling, and pain in her left and right legs that she began to experience within a few weeks of receiving her flu vaccination. She specifically describes her symptoms as beginning on or about October 22, 2013; at the time, she "first began to experience numbness and tingling in [her] hands and legs." Ex. 14 at 2. She is confident that her symptoms began on or around this date because it was close in time to her mother's birthday, which is October 29th. Petitioner initially attributed the numbness and tingling to lower back problems.

Mrs. Kamppi states she continued to experience these same symptoms the entire months of October and November. In November, before Thanksgiving, Petitioner says that her "hands were starting to go numb frequently." *Id.* She became concerned that she would not be able to cook Thanksgiving dinner because of her condition. *Id.*

Petitioner avers that in November 2013, she was "becoming exceedingly fatigued." *Id.* She began "calling off work due to exhaustion and the symptoms [she] was experiencing." *Id.*

According to Petitioner, her symptoms continued to deteriorate in December 2013. Because of their frequency and severity, she routinely discussed her leg pain, numbness, and tingling with members of her family. "By early to mid-January, the pain was so severe and persistent in my left leg (especially the calf area) I thought I was experiencing a blood clot." *Id.* Petitioner stated that she went to urgent care when the left calf pain did not subside after a couple of days. *Id.*

### 3. Affidavit of Mr. Matt Kamppi

Mr. Matt Kamppi, Petitioner's husband, signed his affidavit on July 28, 2016. He states that Petitioner began experiencing pain in her hands a few weeks after receiving her flu vaccination. This pain then spread to her back, legs, and feet by October 2013. Ex. 11 at 1. According to Mr. Kamppi, the only thing that helped ameliorate his wife's pain was going to a massage therapist. "I have been married to Lynsie for 13 years and she gets maybe one massage per year. However, starting in October 2013 she would go weekly to see a massage therapist due to the pain in her back, legs, arms, and hands." *Id.* Mr. Kamppi states that they could not take their children trick-or-treating that year because of his wife's pain. *Id.*

6

### 4. **Affidavit of Ms. Terry Newman**

Ms. Terry Newman, Petitioner's mother, also submitted an affidavit in support of Petitioner's claim. In the document, she describes daily telephonic conversations with her daughter in October 2013 in which Petitioner complained about pain in her hands. According to Ms. Newman, by the last week of October 2013, Petitioner told her mother "about her legs and how much they hurt." Ex. 10 at 2. Petitioner told Ms. Newman that she had been having her husband and children rub her legs, but that it did not relieve her symptoms.

Ms. Newman states that in November 2013, the Kamppis were planning to go to Bob Evans for Thanksgiving dinner because Petitioner "wasnt [sic] up to cooking and peeling potatoes." *Id.* The day before Thanksgiving, Josiah Kamppi, "a cousin … called and said he had been cooking and will bring the whole dinner to them he had even made pies." *Id.*

### 5. **Affidavit of Ms. Donna Wehrman**

Ms. Donna Wehrman worked with Mrs. Kamppi from 2013-2014 at Grant Medical Center in Columbus, Ohio. In her affidavit, she states that in December 2013, Petitioner told her she was being reprimanded by her supervisor for missing too many days of work. Ex. 12 at 1. She also states that Petitioner began experiencing weakness and tingling in her arms and legs "at some point after she received her flu vaccination in September 2013." *Id.*

### 6. **Affidavit of Ms. Holly Shaw**

Ms. Shaw was also one of Mrs. Kamppi's co-workers at Grant Medical Center between 2013 and 2014. In her affidavit, she recounts that Petitioner missed work "numerous times" in late 2013; and further, that Petitioner was called into her supervisor's office due to her many absences. Ex. 13 at 1.

### B. Petitioner's Work Attendance Records and Discipline Records

Petitioner filed her work attendance records from September 1, 2011 through December 31, 2014. These records indicate that she took 137 hours of unscheduled leave from the date the records begin through the date she received her flu shot. Ex. 16 at 1-12. After her flu vaccination, the records show she took 24 hours of unscheduled leave (two 12 hour blocks). *Id.* at 12-14. One was on January 17, 2014 and the other was on January 20, 2014. *Id.* January 17, 2014 was the day before Petitioner first went to OhioHealth Urgent Care due to symptoms of GBS; on January 20, 2014, Petitioner was an inpatient at the Grant Medical Center. Petitioner's work attendance records do not reflect that she took any unauthorized leave during October or November 2013.[3]

---

[3] While I do find these records to be generally accurate, Petitioner correctly noted that she received her flu vaccination on September 28, 2013 while at work; however, the records do not indicate that she worked on that date. Petitioner seemed to assert the records were not accurate or reliable, in that they did not show any unexcused absences in October/November 2013; Petitioner continued to maintain that she frequently called off work during this timeframe. Her testimony on this point is not supported by the evidence in the case.

7

Petitioner also filed her Performance Management Records from Grant Medical Center covering the timeframe of September 1, 2013 through December 31, 2014.[4] The exact dates are not entirely clear from the records, but it appears that Petitioner received corrective action on September 13, 2013, and January 3, 2014.  *See* Ex. 20 at 2.  In the written counseling that Petitioner received on what appears to be September 16, 2013, her then-supervisor, Melissa Patterson, wrote, "7 occurances [sic] of absences has [sic] resulted in this written warning for attendence [sic] per policy.  Attendance policy has been shared with Lynsie.  Effected [sic] dates were as follows: 11/10/12, 12/3/12, 1/21/13, 4/19/13[5], 6/9/13, 8/22/13, 9/16/13."  Petitioner also received a written counseling, apparently on January 3, 2014.  Under "description of behavior/situation & impact" it says, "7 occurances [sic] of absences has [sic] resulted in this written warning for attendence [sic] per policy.  Attendance policy has been shared with Lynsie.  Effected [sic] dates were as follows: 1/21/13, 4/19/13[6], 6/9/13, 8/22/13, 9/16/13, 12/23/13, 12/23/13[7]."

### C. Petitioner's Medical Records

Petitioner was born on April 25, 1981.  She was 32 years old on September 28, 2013, when she received the allegedly causal flu vaccination in her right deltoid at Grant Hospital in Columbus, Ohio.  Ex. 7.

#### 1. Petitioner's Medical History Prior to the Flu Vaccination

Petitioner had a history of irritable bowel syndrome and gastroparesis.  Ex. 2 at 35.  On January 18, 2014, Petitioner told Dr. Steven Simensky that she traveled to Bakersfield, California after receiving her flu vaccination.  Ex. 3 at 19.  While in California, Petitioner stated she was "surrounded by a pandemic of H1N1 flu, which had resulted in several deaths of younger people."[8]  *Id.*  In addition, the medical records indicate that Petitioner stated she had developed sinus symptoms for four days during the prior week (the week of January 5, 2014).[9] *Id.* at 20.

---

[4] According to Petitioner, these records are not reliable because she previously tried to obtain these documents, and Grant Medical Center informed her and Mr. Blumenstiel that no such records existed.  Transcript ("Tr.") at 124.  When they finally did provide them, the copies did not contain her signature.  *Id.*  Mrs. Kamppi avers that she signed each document after she received it.  *Id.* at 123.  I have considered the fact that these records do not contain signatures, that they contain a number of typographical errors, and that they were not originally produced when requested.  However, because they are consistent with Petitioner's work attendance records (with the exceptions noted in footnotes 5 and 6, *infra*), I find them to be generally reliable.

[5] This date is incorrect according to the work attendance records; it should instead indicate 4/9/13.

[6] This date is incorrect according to the work attendance records; it should instead indicate 4/9/13.

[7] Apparently the date 12/23/13 was inadvertently listed twice.

[8] Petitioner adamantly denies making this statement.  Tr. at 121-22.

[9] Petitioner also denies making this statement, and avers that she did not have any type of illness during this timeframe.  Tr. at 117-20.

8

## 2. The Flu Vaccination and Petitioner's Subsequent Medical History

After receiving her flu vaccination on September 28, 2013, Petitioner did not seek medical care until November 19, 2013. Ex. 2 at 29. On that date, she visited Dr. Robert Sears, her primary care physician, for a routine follow-up appointment to address hypoglycemia, anxiety, and depression. The physician's notes from that visit indicate that Petitioner recently began taking a new medication for depression, and that she was responding well to that medication. *Id.* at 29-30. The notes further indicate that Petitioner was "getting some hypoglycemic episodes [which occur] around 10:30am." *Id.* at 29. The notes reflect that at no time during this visit did Petitioner mention numbness, tingling, or pain in her legs. *Id.*

Petitioner did not seek medical care again until January 17, 2014, when she presented to OhioHealth Urgent Care complaining of "decreased mobility, joint tenderness, numbness, tingling in the legs and weakness." Ex. 15 at 1. The patient notes signed by Dr. Ebunoluwa Wion further indicate that onset began "2 days ago" and that Petitioner experienced "sudden onset of leg pain with pins/needles sensation and heaviness x2 days now." *Id.* The notes indicate that Petitioner did not mention experiencing previous symptoms of pain, numbness, and tingling back in October and November 2013 to Dr. Wion at this urgent care visit. *Id.*

After her urgent care visit, Petitioner was referred to the emergency room on that same day, where she was evaluated by Dr. Mark Renz. Ex. 3 at 15. The patient history indicates as follows: "On 1/15/2013[10] patietn [sic] developed left calf pain and numbness/tingling in her LLE[11]. By the next morning this had resolved. Starting 1/17 patient developed recurrent LLE numbness/tingling, left calf pain, and weakness to the LLE. By the afternoon patient developed numbness/tingling to the RLE, pain to the right calf, and weakness of the RLE." *Id.* The ER patient notes do not reference any numbness, pain, or tingling that began prior to January 15, 2014. *Id.*

On January 18, 2014, Dr. Steven Simensky (a neurologist) evaluated Petitioner. The "Assessment and Plan/Recommendations" from this visit state that Petitioner "presents with 3 days h/o rapidly progressive, ascending paresthesias and weakness.…MRI and L-spine normal, LP with normal protein probably d/t early course of disease. The disease nadir is approximately 7-14 days." *Id.* at 19. The notes under "History [o]f Present Illness" state, "32 yo healthy GMC nurse with h/o IBS, gastroparesis, chronic diarrhea presents to GMC with a 3 d y/o progressive LE weakness. Pt states that she received the influenza shot approximately 7 weeks ago[12] without complications, later travelled to Bakersfield, CA for a family emergency and was surrounded by a pandemic of H1N1 flu.…She also developed sinus sx x 4 days last week. She was in this state when on 3 days prior to admission, she developed transient left calf numbness/tingling/pain

---

[10] Although the medical history indicates Petitioner's condition began in 2013, this appears to be a typographical error, and should instead state "2014".

[11] Left lower extremities.

[12] Ex. 7 clearly indicates that Petitioner received her flu vaccination on September 28, 2013, which was 113 days or three months and 22 days before the date she was admitted to the ER.

9

which resolved until yesterday. At that point, her left leg sx recurred along with leg weakness and quickly thereafter, affected her right leg." *Id.* at 19-20. There is no indication in the notes from this visit that Petitioner mentioned experiencing previous symptoms of pain, numbness, and tingling back in October and November 2013 when speaking with Dr. Simensky on January 18, 2014. *Id.*

On January 18, 2014, Dr. Paul Willette examined Petitioner and took her medical history. *Id.* at 40. In his notes, he wrote, "[t]his is a very pleasant 32-year-old female who is an L and D nurse here at Grant. She became sick in the past couple of days…. Her symptoms began Wednesday[13][,] Thursday she states she was not that bad, and today at 4:00 her symptoms progressed." *Id.* The notes do not reflect that Petitioner mentioned experiencing previous symptoms of pain, numbness, and tingling in October and November 2013 to Dr. Willette on January 18, 2014. *Id.*

On January 19, 2014, Petitioner was treated by Dr. George Connell (an anesthesiologist). *Id.* at 22. In recording Petitioner's history, Dr. Connell documented "[s]ymptoms started several days ago now with sensory and motor loss to both lower extremities, left upper extremity weakness." *Id.* There is no indication that Petitioner mentioned experiencing previous symptoms of pain, numbness, and tingling back in October and November 2013 to Dr. Connell on January 19, 2014. *Id.*

On January 21, 2014, Dr. Julian Goodman (an infectious disease physician) treated Petitioner and documented that "last Wednesday started getting some numbness in her calf which fairly quickly progressed into LE weakness and progressive ascending paresis and diagnosed with GBS." *Id.* at 30. The notes do not reflect that Petitioner mentioned experiencing previous symptoms of pain, numbness, and tingling back in October and November 2013 to Dr. Goodman on January 21, 2014. *Id.*

On January 27, 2014, Dr. Nicole Burns treated Petitioner. When drafting the history of Petitioner's present illness, she wrote, "[o]n 1/15 she developed LLL numbness and tingling that resolved by the next morning. Then on 1/17 she again developed recurrent left sided numbness and tingling. She presented when she noticed symptoms on her right side as well with difficulty walking and writing." *Id.* at 34-35. The notes do not reflect that Petitioner related previous symptoms of pain, numbness, and tingling back in October and November 2013 to Dr. Burns on January 27, 2014. *Id.*

Petitioner was discharged from Grant Medical Center on January 28, 2014, and was admitted to the OhioHealth Institute for Rehabilitation on that same day. The OhioHealth Institute for Rehabilitation took Petitioner's medical history upon her admission and documented this history in her medical records. According to these records, "[s]he experienced an episode of numbness, tingling in her left leg on January 15, 2014, and did not pay much attention to it and thought maybe it was some type of musculoskeletal issue and it resolved the next morning but then it returned again in a much worse fashion on January 17, 2014, where the patient had difficulty walking and riding, and she was sent to the hospital from urgent care evaluation." Ex. 4 at 1. During intake at the rehabilitation facility on January 28, 2014, there is no indication that

---

[13] January 15, 2014 was a Wednesday.

Petitioner mentioned experiencing previous symptoms of pain, numbness, and tingling in October and November 2013. *Id.*

### D. Testimony at the Hearing

#### 1. <u>Testimony of Ms. Terry Newman</u>

Ms. Newman's testimony at the hearing was generally consistent with her affidavit. She testified that she and Petitioner spoke every day on the telephone. Tr. at 10. Around the mid-October 2013 timeframe, Petitioner began telling her, "mom, I don't feel good." *Id.* at 11. She said that she could not lift her legs and that her hands hurt. According to Ms. Newman, her daughter does not complain, so she thought something must really be wrong. *Id.* at 12.

Ms. Newman discussed conversations she and her daughter had about Thanksgiving 2013. According to Ms. Newman, Petitioner did not think she could prepare the holiday meal due to the pain in her hands. *Id.* at 15. Ms. Newman said that Petitioner told her she may just have to bring the family to Bob Evans because she was unable to peel potatoes. *Id.* Matt's cousin ended up bringing Thanksgiving dinner to the Kamppi family that year. *Id.*

Around the Thanksgiving timeframe, Ms. Newman testified that Petitioner said she was hardly able to use her hands; she could not lift pans; and she could not lift her legs to get into the bathtub because they were too heavy. *Id.* at 16.

When asked on cross-examination whether she ever suggested that her daughter see a doctor about her symptoms, Ms. Newman stated that she thought Lynsie was just working too many long shifts; she further testified that her daughter was smart; if Lynsie thought she needed to see a doctor, she would have gone to one. *Id.* at 23.

#### 2. <u>Testimony of Ms. Donna Wehrman</u>

In 2013, Ms. Wehrman was a labor and delivery nurse at Grant Medical Center; she worked with Petitioner during this timeframe. *Id.* at 30. Ms. Wehrman testified that she and Petitioner worked together frequently; that Petitioner was a great worker; and that she did not have many unexcused absences from work prior to her flu shot.[14] *Id.* at 33, 35.

Ms. Wehrman specifically recalled one conversation in the beginning of December 2013 where Petitioner called her crying because she had just been reprimanded by her supervisor for missing work. *Id.* at 34-35. She believed that the timeframe for Petitioner's absences was the

---

[14] As the work attendance records demonstrate, Mrs. Kamppi took unscheduled leave from work in 2012 on February 15, 2012, May 11, 2012, July 18, 2012, August 17, 2012, November 10, 2012, and December 3, 2012. She took unscheduled leave from work in 2013 on January 21, 2013, April 9, 2013, June 9, 2013, August 22, 2013, and September 16, 2013. *See* Ex. 16 at 3-12.

11

end of September, 2013.[15] *Id.* at 37. She is unsure as to the reasons Petitioner was absent from work. *Id.* at 36.

Ms. Wehrman testified that around the end of December 2013, Petitioner began complaining that her legs were feeling heavy. *Id.* at 33.

### 3. Testimony of Ms. Holly Shaw

Ms. Shaw was also a labor and delivery nurse at Grant Medical Center in 2013 when she worked with Petitioner. *Id.* at 41. Ms. Shaw testified that Petitioner was in good health until the end of 2013. *Id.* at 42. During that timeframe, she started calling off work. *Id.*

Ms. Shaw testified that in October/November 2013, Petitioner complained that she did not feel quite right, and that her legs felt heavy.[16] *Id.* at 43. She was confident the conversation took place during this timeframe. *Id.* at 50. Ms. Shaw also testified that Petitioner told her she got massages to help alleviate her symptoms. *Id.* at 43.

Ms. Shaw testified that prior to September 2013, Petitioner was a wonderful employee and a dependable nurse. *Id.* at 44-45. After the vaccination, she noticed that Petitioner began calling off work. *Id.* at 45.

### 4. Testimony of Mr. Matt Kamppi

Mr. Kamppi testified at hearing that his wife was in generally good health prior to her 2013 flu vaccination. *Id.* at 54. After she received the vaccine, Petitioner started complaining about tingling in her hands, back, and feet. *Id.* at 56. Mr. Kamppi did not suggest that she go to the doctor because their health insurance "is not too good." *Id.* While he testified that he was not sure how much they were required to pay out of pocket, he said "our deductibles are so bad," and that it was "around a couple thousand." *Id.* at 61, 57. Mr. Kamppi also testified that Petitioner tried to work through her symptoms because things were still tolerable. *Id.* at 61.

Mr. Kamppi testified that his wife's symptoms began around the end of September 2013. He is confident this timeframe is accurate because deer season starts at the end of September, and he recalls not being able to go hunting because Petitioner was not feeling well. *Id.* at 57-58.

Instead of going to the doctor, Mrs. Kamppi had her husband and children rub her legs, and she also started receiving massages to alleviate her symptoms. *Id.* at 58-60. According to Mr. Kamppi, she went to "a hole in the wall massage place" that was operated by their neighbor, "Michelle." *Id.* at 60-61. According to him, Petitioner would pay in cash each time she went for a massage.[17] *Id.* at 61.

---

[15] I find that the work attendance records more accurately reflect Petitioner's work schedule than the memory of her co-workers. The work attendance records show that Petitioner did not have any unscheduled leave after her flu vaccination in September 2013 or in October 2013, as discussed, *supra*.

[16] This information was not contained in Ms. Shaw's affidavit.

[17] No records were produced at the hearing substantiating these massage visits.

Mr. Kamppi testified that Petitioner was unable to take the children trick-or-treating because she was tired and was generally not feeling well. Instead, he bought them candy and they watched a movie together. *Id.* at 63.

Similarly, around the Thanksgiving holiday, Petitioner was feeling unwell. According to Mr. Kamppi, his cousin either brought Bob Evans over to their house, or he cooked it himself. "My cousin brought food from -- I think it was Bob Evans or something or he cooked it himself. I think he cooked it himself. I'm not sure, but I know he brought the food." *Id.* at 64.

Mr. Kamppi testified that his wife's symptoms began in October/November of 2013, and progressed until she required hospitalization in January 2014. *Id.* at 74-75.

He was with Petitioner when she was admitted to the ER in January of 2014. *Id.* at 75. During this time, they spoke with several doctors. Mr. Kamppi does not recall Petitioner stating that her symptoms began on Wednesday, January 15th. *Id.* at 77. When asked whether he and Petitioner mentioned the symptoms of numbness and tingling that Petitioner was experiencing in October, November, and December to any of the doctors in the ER, Mr. Kamppi stated,

> I might have mentioned something like that to them, yeah. I think I did. I know we did -- once everything calmed down and we saw the neurologist, I think that's when we mentioned it to him, the neurologist. Once like -- I was like a couple -- like a day later when the neurologist -- we saw the neurologist come into the room and he explained what Guillain-Barré was and everything. And then that's when I told him, like, hey, she has -- you know, she has been feeling like this since like, you know, the October time frame. And he goes, yep -- he goes, yep, it's the stupid flu vaccine. I remember him saying that.

*Id.* at 79.

When Respondent's counsel asked Mr. Kamppi why Dr. Simensky did not reference this conversation in Petitioner's medical records, Mr. Kamppi replied, "I don't know why -- I don't know why -- I guess I don't know why he didn't put it in there. Maybe -- I don't know. Maybe he was in a hurry." *Id.* at 81.

### 5. Testimony of Mrs. Kamppi

Petitioner testified at the hearing that she has not worked since a few days before her hospitalization due to GBS on January 17, 2014. *Id.* at 88. At the time of her hospitalization, Petitioner was a labor and delivery nurse at Grant Medical Center in Ohio. She began working in that position in August of 2010. *Id.*

Petitioner testified that she was in pretty good health prior to her flu vaccination. *Id.* at 92. In 2013, she was rear ended while driving her car, and suffered a herniated disc as a result of

that accident. The herniated disc caused her to experience a sensation of tingling and pins and needles in her arms and legs. *Id.* at 90.

Petitioner's mother had broken her leg in January of 2013, and was staying with Petitioner as her leg healed. *Id.* at 91. When her mother left to go home to California, Petitioner testified that she missed her and became depressed. *Id.* Her doctor prescribed Lexapro for depression. *Id.* She began to experience tingling in her arms and legs and learned that it was a side effect of the Lexapro. *Id.* She visited Dr. Sears in August to address this tingling sensation; Dr. Sears changed her antidepressant from Lexapro to Wellbutrin. *Id.* According to Petitioner, this alleviated her symptoms of tingling and pins and needles. *Id.* at 92.

Petitioner did not want to receive her flu shot because she was worried about getting the flu; the vaccine was mandated by her employer, so she received it while at work. *Id.* at 93-94. She testified that within one week, she began to develop flu-like symptoms. *Id.* at 94. Then, starting around the middle of October 2013, Petitioner testified that she began feeling tingling in her hands and heaviness in her legs accompanied by a pins and needles sensation. *Id.* at 94-95. She stated that she complained about it to her husband who told her she was fine. *Id.* at 96. According to Petitioner, she began calling off work because of her symptoms. *Id.* at 96-97.

Mrs. Kamppi discussed not going to the doctor because her insurance was expensive. She testified they had a $2,200 deductible, which according to her, kept her out of the doctor's office. *Id.* at 99. Mrs. Kamppi also referenced the $2,200 payment during cross examination. When Respondent's counsel asked her whether insurance paid for her visits to her primary care doctor, her response was "[w]ell, I have to pay $2,200 at that point out of pocket before insurance paid the 80/20 plan." *Id.* at 129. Mrs. Kamppi clarified that a visit to her primary care doctor cost about $100. *Id.* at 163.

Instead of visiting the doctor, Petitioner described mentioning her symptoms to residents at the hospital and asking their opinion. *Id.* at 100.

In order to alleviate her symptoms, Petitioner testified that she asked her husband and children to rub her legs. *Id.* at 100-01. She also visited a "hole in the wall" massage parlor run by her friend and neighbor, Michelle Cook. *Id.* at 102. Because Michelle gave her a "friend discount," it was less expensive to get a massage than it was to go to the doctor. *Id.*

During November 2013, Petitioner stated that her symptoms were still present. According to Mrs. Kamppi, she told her husband that they might have to go to Bob Evans for Thanksgiving dinner because she was not sure she was up for cooking it. The family ended up having Thanksgiving dinner at their house because their cousin prepared food for everyone and brought it over. *Id.* at 105.

Petitioner visited her primary care physician on November 19, 2013. During that visit, she did not report the symptoms of tingling, numbness, fatigue and pain to Dr. Sears. Respondent's counsel asked her about this:

>    MR. ALL: So back to my question, did you report your symptoms of tingling, numbness, fatigue, pain to Dr. Sears at this visit?
>
>    PETITIONER: If it's not in there, then maybe I did not because I was there for something completely different. I was there for my blood sugar.
>
>    MR. ALL: In the past, you've told Dr. Sears of those same types of symptoms when you've visited him in the past, but you didn't now. So the reasoning is why?
>
>    PETITIONER: Because the reason before, that was my reason for going to him was for the numbness and the tingling. This time, I was strictly there for my blood sugar.

*Id.* at 137.

In January 2014, Petitioner's symptoms changed. After she returned from her trip to Bakersfield, California, Petitioner testified that she felt a sharp pain in her calf on Wednesday, January 15, 2014. *Id.* at 108. Since the pain subsided and then returned, Petitioner went to Urgent Care and then to the ER. *Id.* at 109-10. When she provided her histories to the various treating physicians, Mrs. Kamppi said that she did not mention experiencing symptoms in October and November of 2013. *Id.* at 111. She provided several different explanations for this omission.

First, Petitioner discussed how hectic the Urgent Care and ER visits were. She described not being able to walk or move her legs, her children being present, and all the different things going through her mind. She described the visits as chaotic. *Id.* at 111. Secondly, she stated that she did not believe the purported symptoms she experienced in October and November 2013 were relevant to what was happening to her in January 2014. "[I]t was something different. It was dragging my leg and a sharp pain in my calf versus just numbness and tingling from what I had prior." *Id.* at 111-12. Additionally, Petitioner said that she did discuss these symptoms with her doctors, at least in part: "I know things were mentioned about weakness, especially because I had just flown and I was starting to have a lot of pain in my left calf. I know I started mentioning things about weakness. As far as mentioning about tingling and numbness, I don't recall.…" *Id.* at 151-52. Finally, Petitioner explained that she directly and literally answered the doctor's questions about onset and duration of symptoms: "She asked me when the sharp pain in my calf started and I told her it -- that sharp pain started coming Wednesday." *Id.* at 140.

## IV. Findings of Fact

In order to overcome the presumption that contemporaneous written medical records are accurate, testimony must be "consistent, clear, cogent, and compelling." *Blutstein*, 1998 WL 408611, at *5. Because of this presumption, "special masters in this Program have traditionally declined to credit later testimony over contemporaneous records." *Sturdivant v. Sec'y of Health*

15

*& Human Servs.,* No. 07-788V, 2016 WL 552529, at *15 (Fed. Cl. Spec. Mstr. January 21, 2016). *See, e.g., Stevens v. Sec'y of Health & Human Servs.*, No. 90–221V, 1990 WL 608693, at *3 (Cl. Ct. Spec. Mstr. December 21, 1990); see also *Vergara v. Sec'y of Health & Human Servs.*, No. 08–882V, 2014 WL 2795491, at *4 (Fed. Cl. Spec. Mstr. July 17, 2014) ("Special Masters frequently accord more weight to contemporaneously-recorded medical symptoms than those recorded in later medical histories, affidavits, or trial testimony."); *See also, Cucuras*, 993 F.2d at 1528 (noting that "the Supreme Court counsels that oral testimony in conflict with contemporaneous documentary evidence deserves little weight").

Based on my review of the medical records, affidavits, documentary evidence, and hearing testimony, I make the following findings of fact, by a preponderance of the evidence:

1. Petitioner received a flu vaccination on September 28, 2013.

2. Petitioner went to see her primary care physician on November 19, 2013 to address her symptoms of hypoglycemia; during this visit, she also discussed her new anxiety/depression medication.

3. Petitioner traveled to Bakersfield, California in the December 2013/January 2014 timeframe for a family emergency. She traveled there by herself.

4. Petitioner developed left calf pain, along with numbness and tingling in her left leg on January 15, 2014. These symptoms dissipated and appeared to resolve by the next day.

5. On January 17, 2014, the left calf pain, numbness, tingling, and left leg weakness returned. Petitioner also developed pain, numbness, and tingling in her right leg later that day.

6. Petitioner went to urgent care and then the emergency room on January 17, 2014 as a result of the symptoms that began on January 15, 2014.

7. Petitioner was diagnosed with GBS on January 18, 2014.

8. The medical records in this case are clear, internally consistent, and complete.

9. Petitioner spoke with nine different medical providers between November 2013 and January 2014. There is no reference in these records to onset of pain, numbness, and tingling beginning in October or November 2013. Instead, each provider documents that Petitioner began experiencing these symptoms on Wednesday, January 15, 2014.

10. Accordingly, I find that Petitioner did not begin to experience symptoms of numbness, tingling, or pain associated with onset of GBS until January 15, 2014.

In making these factual determinations, I have ultimately concluded that the medical records and medical histories, provided close-in-time to Petitioner's injury, are more persuasive

than the affidavits and testimony presented by Mrs. Kamppi, her family members, and former co-workers between 18 months and four years after the fact.

I found several components of Mrs. Kamppi's medical history to be especially persuasive regarding the issue of onset. First, Mrs. Kamppi did not seek medical attention to address numbness, pain, and tingling from the time she alleges her symptoms began (mid-October 2013) until she presented to urgent care and then the emergency room in January 2014. Significantly, the one time Petitioner did visit a doctor during this timeframe, she did not mention anything about pain, numbness, and tingling in her arms and legs or that she was experiencing debilitating fatigue. In fact, under the "Review of Systems" section of the history, the notes from the November 19th visit state that "[p]atient denies fatigue.…" Ex. 2 at 29. This annotation stands in contrast to Petitioner's second affidavit where she complains of increasing fatigue in November 2013. "Also in November, I was becoming exceedingly fatigued. In fact, I was calling off work due to exhaustion and the symptoms I was experiencing, especially those in my legs." Ex. 14 at 2.

This November 19th medical appointment took place nine days before Thanksgiving (Thanksgiving 2013 was on November 28th) and 19 days after Halloween. According to affidavits submitted on her behalf, Petitioner was experiencing such severe symptoms during this timeframe that she was unable to take her children trick-or-treating or prepare Thanksgiving dinner for her family.

Petitioner and her husband also discussed the disincentive to seek medical treatment created by the high cost of their insurance. It follows that when Petitioner _did_ spend the money to go see a doctor, she would mention all the symptoms she was experiencing, and not leave anything out. Given the severity of the symptoms, the impact on her family, and the concern with cost of medical care, it seems unreasonable that Petitioner would not mention, and/or discuss these medical problems she purports to have been experiencing at this time with her primary care doctor during her appointment on November 19, 2013.

Also confounding to her claim, Petitioner was unable to produce any objective documentation corroborating onset of her symptoms in October or November 2013, despite being provided more than two years to do so. She did produce the affidavits and testimony of Mses. Wehrman and Shaw which discuss Petitioner's absences from work, but they do not establish that any absences occurred in October or November, 2013. While the testimony of both does go further than the affidavits (both witnesses testified that Petitioner called off work in September 2013), the attendance records refute their testimony. Also, while Ms. Shaw did testify that in the October or November 2013 timeframe, Petitioner complained that her legs felt "heavy and not quite right," I do not find this testimony to be credible.[18]

---

[18] At the beginning of her testimony, Ms. Shaw struggled to remember how long she had lived at her current residence.

> MR. BLUMENSTIEL: And tell the Court where you live and how long you've been living there.
>
> MS. SHAW: 538 Rolling Acre Drive, Lithopolis, Ohio 43138. And I've been living there since, goodness, I think 2000- -- oh, my goodness, it's been –

In addition, Petitioner submitted her timesheets showing that she took 161 hours of unscheduled leave between September 1, 2011 and January 20, 2014. However, this attendance record does not support her contention that she "was calling off work due to exhaustion and the symptoms [she] was experiencing, especially those in [her] legs." *Id*. In fact, of those 161 hours, 137 (or 85%) were taken before Petitioner received her flu vaccination. The remaining 24 hours represent two days in January 2014, after she began to develop symptoms of GBS. The records show that Mrs. Kamppi did not take any unscheduled leave between the date she received her flu shot, and the date she was hospitalized in January 2014.

Finally and most significantly, eight different physicians treated Mrs. Kamppi in January 2014 (nine, including the treatment in November 2013), and each documented his or her treatment with detailed notes. The medical records are internally consistent; each relevant entry establishes that Petitioner began to experience symptoms of GBS in mid-January 2014. Importantly, this is not a case where Petitioner failed to see a doctor about her condition. She presented for treatment in January 2014 and told all eight physicians that she began to experience symptoms several days prior. As noted in *Lowrie*, this affirmative statement regarding onset is significant: "it must be recognized that the absence of a reference to a condition or circumstance is much less significant than a reference which negates the existence of the condition or circumstance." *Lowrie*, 2006 WL, at *7. Mrs. Kamppi's repeated statements to her medical providers that her symptoms of pain, numbness, and tingling began two days prior to her hospital admission effectively refute the occurrence of onset in October or November 2013.

Ultimately, the weight of the evidence in this case demonstrates that Petitioner most likely began experiencing symptoms of GBS on January 15, 2014. Petitioner's testimony, affidavits, and other documentary evidence in the face of contrary medical record evidence do not carry her burden of persuasion.

## V. Conclusion

I find that Petitioner did not begin to experience symptoms of numbness, tingling, or pain associated with onset of GBS until January 15, 2014.

---

MR. BLUMENSTIEL: A ballpark is fine.

MS. SHAW: Probably about -- probably about seven years. Is that fine? (Tr. at 38-39).

She then could not remember when she and Petitioner began working together.

MR. BLUMENSTIEL: When did you first meet Lynsie?

MS. SHAW: I met Lynsie when I worked in the antepartum high risk unit on labor and delivery back in -- I started in labor and delivery probably about five years -- I would say in 2000 and -- I'm not even sure what year it was. Probably about four or five years ago.

MR. BLUMENSTIEL: Is when you first met Lynsie?

MS. SHAW: No, probably about six years ago. (Tr. at 41).

Her ease and certainty in remembering that her conversation with Petitioner occurred in the October/November timeframe of 2013, more than four years after the fact, seems incongruent with her inability to remember the year she moved into her house or the year she met Mrs. Kamppi.

The following is therefore ORDERED:

By no later than Monday, June 11, 2018, Petitioner shall either file an expert report supporting onset of GBS symptoms 15 weeks and five days after flu vaccination, or a status report indicating how she intends to proceed.

**IT IS SO ORDERED.**

**s/Katherine E. Oler**
Katherine E. Oler
Special Master
