# In the United States Court of Federal Claims

**OFFICE OF SPECIAL MASTERS**
**No. 15-1013V**

| | |
|---|---|
| LYNSIE KAMPPI, Petitioner, | **TO BE PUBLISHED** |
| v. | Special Master Katherine E. Oler |
| SECRETARY OF HEALTH AND HUMAN SERVICES, Respondent. | Filed: November 6, 2020 |
| | Attorneys' Fees and Costs; Reasonable Basis |

*Braden Blumenstiel*, The Law Office of DuPont & Blumenstiel, Dublin, OH, for Petitioner.
*Linda Renzi*, U.S. Department of Justice, Washington, DC, for Respondent.

## DECISION ON FINAL ATTORNEYS' FEES AND COSTS[1]

On September 14, 2015, Lynsie Kamppi ("Ms. Kamppi" or "Petitioner") filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. § 300aa-10, *et seq*.[2] (the "Vaccine Act" or "Program") alleging she developed Guillain-Barré syndrome ("GBS") from the influenza ("flu") vaccination she received on September 28, 2013. Pet. at 1, ECF No. 1.

Because I find the petition did not possess a reasonable basis when it was filed or at any time during the pendency of this case, I hereby **DENY** Petitioner's application for attorneys' fees and costs.

[1] This Decision will be posted on the United States Court of Federal Claims' website, in accordance with the E-Government Act of 2002, 44 U.S.C. § 3501 (2012). **This means the Decision will be available to anyone with access to the internet**. As provided in 42 U.S.C. § 300aa-12(d)(4)(B), however, the parties may object to the Decision's inclusion of certain kinds of confidential information. To do so, each party may, within 14 days, request redaction "of any information furnished by that party: (1) that is a trade secret or commercial or financial in substance and is privileged or confidential; or (2) that includes medical files or similar files, the disclosure of which would constitute a clearly unwarranted invasion of privacy." Vaccine Rule 18(b). Otherwise, this Decision will be available to the public in its present form. *Id.*

[2] The Vaccine Program comprises Part 2 of the National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755 (codified as amended at 42 U.S.C. §§ 300aa-10–34 (2012)) (hereinafter "Vaccine Act" or "the Act"). All subsequent references to sections of the Vaccine Act shall be to the pertinent subparagraph of 42 U.S.C. § 300aa.

## I. Petitioner's Relevant Medical History

### A. Petitioner's Medical History Prior to the Flu Vaccination

Petitioner had a history of irritable bowel syndrome and gastroparesis. Ex. 2 at 35. On January 18, 2014, Petitioner told Dr. Steven Simensky that she traveled to Bakersfield, California after receiving her flu vaccination. Ex. 3 at 19. While in California, Petitioner stated she was "surrounded by a pandemic of H1N1 flu, which had resulted in several deaths of younger people."[3] *Id.* In addition, the medical records indicate that Petitioner stated she had developed sinus symptoms for four days during the prior week (the week of January 5, 2014).[4] *Id.* at 20.

### B. The Flu Vaccination and Petitioner's Subsequent Medical History

Petitioner received a flu vaccine on September 28, 2013. Ex. 7 at 1. Petitioner next sought medical care on November 19, 2013. Ex. 2 at 29. On that date, she visited Dr. Robert Sears, her primary care physician ("PCP"), for a routine follow-up appointment to address hypoglycemia, anxiety, and depression. *Id.* The physician's notes from that visit indicate that Petitioner recently began taking a new medication for depression, and that she was responding well to that medication. *Id.* at 29-30. The notes further indicate that Petitioner was "getting some hypoglycemic episodes [which occur] around 10:30am." *Id.* at 29. The notes did not reflect any mention of Petitioner experiencing numbness, tingling, or pain in her legs. *Id.*

Petitioner did not seek medical care again until January 17, 2014, when she presented to OhioHealth Urgent Care complaining of "decreased mobility, joint tenderness, numbness, tingling in the legs and weakness." Ex. 15 at 1. The patient notes signed by Dr. Ebunoluwa Wion further indicate that onset began "2 days ago" and that Petitioner experienced "sudden onset of leg pain with pins/needles sensation and heaviness x2 days now." *Id.* The notes do not indicate that Petitioner mentioned experiencing previous symptoms of pain, numbness, and tingling back in October and November 2013 to Dr. Wion at this urgent care visit. *Id.*

After her urgent care visit, Petitioner was referred to the emergency room on that same day, where she was evaluated by Dr. Mark Renz. Ex. 3 at 15. The patient history indicates as follows:

> On 1/15/2013[5] patietn [sic] developed left calf pain and numbness/tingling in her LLE. By the next morning this had resolved. Starting 1/17 patient developed recurrent LLE numbness/tingling, left calf pain, and weakness to the LLE. By the

[3] Petitioner adamantly denies making this statement. Tr. at 121-22.

[4] Petitioner also denies making this statement and avers that she did not have any type of illness during this timeframe. Tr. at 117-20.

[5] Although the medical history indicates Petitioner's condition began in 2013, this appears to be a typographical error, and should instead state "2014".

> afternoon patient developed numbness/tingling to the RLE, pain to the right calf, and weakness of the RLE.

*Id.* The ER patient notes do not reference any numbness, pain, or tingling that began prior to January 15, 2014. *Id.*

On January 18, 2014, Dr. Steven Simensky (a neurologist) evaluated Petitioner. The "Assessment and Plan/Recommendations" from this visit stated that Petitioner "presents with 3 days h/o rapidly progressive, ascending paresthesias and weakness.…MRI and L-spine normal, LP with normal protein probably d/t early course of disease. The disease nadir is approximately 7-14 days." Ex. 3 at 19. The notes under "History [o]f Present Illness" stated,

> 32 yo healthy GMC nurse with h/o IBS, gastroparesis, chronic diarrhea presents to GMC with a 3 d y/o progressive LE weakness. Pt states that she received the influenza shot approximately 7 weeks ago[6] without complications, later travelled to Bakersfield, CA for a family emergency and was surrounded by a pandemic of H1N1 flu.…She also developed sinus sx x 4 days last week. She was in this state when on 3 days prior to admission, she developed transient left calf numbness/tingling/pain which resolved until yesterday. At that point, her left leg sx recurred along with leg weakness and quickly thereafter, affected her right leg.

*Id.* at 19-20. There is no indication in the notes from this visit that Petitioner mentioned experiencing previous symptoms of pain, numbness, and tingling back in October and November 2013 when speaking with Dr. Simensky. *Id.*

On January 18, 2014, Dr. Paul Willette examined Petitioner and took her medical history. Ex. 3 at 40. In his notes, he wrote, "This is a very pleasant 32-year-old female who is an L and D nurse here at Grant. She became sick in the past couple of days…. Her symptoms began Wednesday[7][,] Thursday she states she was not that bad, and today at 4:00 her symptoms progressed." *Id.* The notes do not reflect that Petitioner mentioned experiencing previous symptoms of pain, numbness, and tingling in October and November 2013 to Dr. Willette. *Id.*

On January 19, 2014, Petitioner was treated by Dr. George Connell, an anesthesiologist. Ex. 3 at 22. In recording Petitioner's history, Dr. Connell documented "[s]ymptoms started several days ago now with sensory and motor loss to both lower extremities, left upper extremity weakness." *Id.* There is no indication that Petitioner mentioned experiencing previous symptoms of pain, numbness, and tingling back in October and November 2013 to Dr. Connell. *Id.*

On January 21, 2014, Dr. Julian Goodman, an infectious disease physician, treated Petitioner and documented that "last Wednesday started getting some numbness in her calf which fairly quickly progressed into LE weakness and progressive ascending paresis and diagnosed with GBS." *Id.* at 30. The notes do not reflect that Petitioner mentioned experiencing previous

[6] Ex. 7 clearly indicates that Petitioner received her flu vaccination on September 28, 2013, which was 113 days or three months and 22 days before the date she was admitted to the ER.

[7] January 15, 2014 was a Wednesday.

symptoms of pain, numbness, and tingling back in October and November 2013 to Dr. Goodman. *Id.*

On January 27, 2014, Dr. Nicole Burns treated Petitioner. Ex. 3 at 34. When drafting the history of Petitioner's present illness, she wrote, "[o]n 1/15 she developed LLL numbness and tingling that resolved by the next morning. Then on 1/17 she again developed recurrent left sided numbness and tingling. She presented when she noticed symptoms on her right side as well with difficulty walking and writing." *Id.* at 34-35. The notes do not reflect that Petitioner related previous symptoms of pain, numbness, and tingling back in October and November 2013 to Dr. Burns. *Id.*

Petitioner was discharged from Grant Medical Center on January 28, 2014 and was admitted to the OhioHealth Institute for Rehabilitation on that same day. Ex. 3 at 37-38. The OhioHealth Institute for Rehabilitation took Petitioner's medical history upon her admission and documented this history in her medical records. According to these records, "[s]he experienced an episode of numbness, tingling in her left leg on January 15, 2014, and did not pay much attention to it and thought maybe it was some type of musculoskeletal issue and it resolved the next morning but then it returned again in a much worse fashion on January 17, 2014, where the patient had difficulty walking and riding, and she was sent to the hospital from urgent care evaluation." Ex. 4 at 1. During intake at the rehabilitation facility on January 28, 2014, there is no indication that Petitioner mentioned experiencing previous symptoms of pain, numbness, and tingling in October and November 2013. *Id.*

Additional medical records were submitted but are not relevant to this Decision.

## II.     Procedural History

On September 14, 2015, Petitioner filed a petition alleging that she suffered from GBS as a result of a flu vaccination administered on September 28, 2013. Pet., ECF No. 1. Petitioner filed medical records on October 2, 2015 and February 26, 2016. ECF Nos. 8, 12.

On April 12, 2016, Respondent filed a Rule 4(c) Report stating that "[P]etitioner has failed to demonstrate entitlement to compensation and her petition for compensation should be dismissed." ECF No. 17.

Petitioner filed affidavits on September 20, 2016, October 12, 2016, and November 11, 2016. Exs. 10-14. She then filed additional medical records on February 15, 2017. Exs. 15-20.

The parties appeared for a telephonic status conference before former Special Master Hastings on March 22, 2017. ECF No. 43. Special Master Hastings informed the parties of his retirement and explained that scheduling further proceedings in this case was not appropriate until a new special master was appointed. *Id.* Scheduling an onset hearing was also discussed, and Special Master Hastings noted that "based on [his] review of the relevant medical records, it appear[ed] that there [was] no support in those records for Petitioner's allegations concerning the time of onset of Petitioner's injury." *Id.* at 1. Special Master Hastings "advised counsel that, in such circumstances, it may be difficult for the new special master to find that there existed a reasonable basis to proceed with this case." *Id.*

This case was reassigned to Special Master Corcoran on October 5, 2017. ECF No. 48. This case was subsequently reassigned to me on December 5, 2017. ECF No. 50.

I held a status conference on December 21, 2017 to discuss the next steps in this case. ECF No. 51. During the status conference, Respondent noted that a fact hearing was not necessary, and questioned reasonable basis. *Id.* Petitioner's counsel emphasized that the affidavits support Petitioner's alleged date of onset and further suggested that Petitioner and her witnesses be afforded the opportunity to testify at the hearing. *Id.*

I held a fact hearing on March 23, 2018 in Washington, DC to determine the date of onset of Petitioner's GBS. I issued my ruling on onset on April 26, 2018. In that ruling, I found that Petitioner did not begin to experience symptoms associated with GBS until January 15, 2014. *See* Ruling on Onset at 2, ECF No. 59. I directed Petitioner to either file an expert report supporting onset of GBS symptoms 15 weeks and five days after flu vaccination or a status report indicating how she intended to proceed. *Id.*

On June 11, 2018, Petitioner filed her first request for a continuance, requesting a 30-day extension of time to "obtain an expert report linking [P]etitioner's vaccine to her injury with a date of onset beginning January 15, 2014." *See* ECF No. 61 at 1. I granted that Motion on June 13, 2018 and ordered Petitioner to file her expert report by July 11, 2018. *See* non-PDF Order on 6/13/2018. In that Order, I also directed Petitioner to request a status conference if she was unable to timely file her expert report. *Id*.

On July 11, 2018, in lieu of filing her expert report, Petitioner filed a status report requesting a status conference. *See* ECF No. 62. In that status report, Petitioner represented that an expert had been provided with the necessary materials, and that a report would be produced within the next three to six weeks.[8] *Id*.

I held a status conference on August 13, 2018, primarily to discuss Petitioner's efforts to obtain an expert report in this case. *See* Minute Entry on 8/13/2018; *see also* Scheduling Order on 8/13/2018, ECF No. 63. At that time, Petitioner's counsel represented that an expert report was now expected within three weeks. Respondent again questioned whether there was a reasonable basis for Petitioner's claim. *See* Scheduling Order on 8/13/2018, ECF No. 63. I informed

---

[8] Specifically, Petitioner represented the following regarding her counsel's progress in procuring an expert report:

> Petitioner has submitted materials to an expert and notified the expert of Special Master Oler's Ruling on Onset determination that [P]etitioner first experienced symptoms on January 15, 2014. Counsel for [P]etitioner has notified the expert that any opinions must be based on the Ruling that the symptoms first began on January 15, 2014. Counsel for [P]etitioner has been informed a report will likely be available within 3 to 6 weeks.

ECF No. 62 at 1. Thus, I note that, as of the date of Petitioner's status report of July 11, 2018, Petitioner and her counsel represented to the Court that Petitioner will file her expert report by August 22, 2018, *i.e.*, six weeks after her status report.

Petitioner's counsel that, in light of my Ruling, I also questioned whether there was a reasonable basis to proceed in this case. *See id.* Additionally, I expressed my concerns to Petitioner's counsel that "Petitioner does not have a reasonable likelihood of proving a medically appropriate temporal relationship of 15 weeks and five days between [Petitioner's] vaccination and onset of [her] GBS." *Id.* at 1.[9] Moreover, I relayed to Petitioner's counsel that there has not been a successful case in the Program to hold that such a lengthy time frame between vaccination and onset of GBS is medically reasonable to support causation. *Id.* Nonetheless, I granted Petitioner's second extension of time, ordering Petitioner to now file her expert report or status report by October 15, 2018. *Id.*

On October 15, 2018, Petitioner filed a status report requesting a third extension of time. *See* Status Rep. on 10/15/2018, ECF No. 64. In that status report, Petitioner again represented that an expert has been contacted, and a report should be available in four weeks. In response to Petitioner's status report (ECF No. 64), I issued an Order granting Petitioner's third request for an extension of time. ECF No. 65. In that Order, I detailed Petitioner's numerous attempts to produce an expert opinion that supports onset of GBS following flu vaccination at 15 weeks and five days. *Id*. I further clarified that no further extensions of time would be entertained and that, if Petitioner does not file her expert report, an order to show cause would be issued. *Id*.

On November 15, 2018, Petitioner filed her fourth request for an extension of time.[10] *See* Mot. for Extension on 11/15/2018, ECF No. 66. In that Motion, Petitioner represented that she was in possession of medical literature and a medical literature review conducted by Dr. James Lyons-Weiler. *Id.* Petitioner claimed, however, that the expert report from Dr. Lyons-Weiler had not been signed and that Petitioner required until December 15, 2018, to obtain the signed report. *Id*. Petitioner further represented that she had not previously filed a motion for enlargement of time with regard to this matter. *Id.*

On November 16, 2018, following the informal communications conducted between chambers and the parties, Petitioner filed two documents labeled as "Expert Reports of Dr. James Lyons-Weiler." *See* ECF No. 67, 68. After reviewing the documents, I notified the parties that a status conference was necessary in order to determine Petitioner's next steps.

I held a status conference that same day, on November 16, 2018. *See* Minute Entry on 11/16/2018. During that status conference, I allowed Respondent's counsel to comment on the documents filed by Petitioner that day. *See* Scheduling Order on 11/16/2018, ECF No. 70. As articulated thoroughly in my Order filed on November 16, 2018, Respondent did not view the documents to be at the substantive level of expert reports or to address a causation theory. *Id*. When given an opportunity to respond, Petitioner's counsel agreed that these were not expert

[9] During that status conference, I also told Petitioner's counsel that if Petitioner is unable to obtain an expert report, Petitioner's counsel shall "show this Order to Petitioner and discuss dismissal of the petition." ECF No. 63 at 1.

[10] Petitioner further added that "Petitioner has not been able to communicate with counsel for respondent with regard to this request, but will reach out to her as soon as possible." ECF No. 66. Respondent's counsel informed chambers, through informal communications that he had not been contacted by Petitioner or notified of the Motion (ECF No. 66).

reports and did not address the issue of onset. *Id*. Petitioner's counsel added that he was aware the documents would "not have a huge impact" on the prosecution of the claim but filed them since they were the only evidence Petitioner was able to produce. *Id*.

I informed Petitioner's counsel that I did not view the documents to be adequate medical literature reviews and noted that no literature had been filed in support of the claim. *See* Scheduling Order on 11/16/2018. I further impressed upon Petitioner's counsel that, given the insurmountable issue of onset in this case, Petitioner should move to dismiss her claim. *Id*. I directed Petitioner's counsel to speak with Petitioner regarding the dismissal of the claim and file a status report by November 26, 2018, indicating how she wished to proceed. *Id*.

Petitioner did not file her status report on November 26, 2018, as directed, but on November 27, 2018, filed a request for an extension of time to file her status report. *See* ECF No. 71. Petitioner represented that she had spoken with her counsel, and that she directed her counsel to conduct further research regarding the issue of GBS onset. *Id*. Petitioner stated that she would consider dismissal of the claim only after her counsel had presented her with this research. *Id*. I granted Petitioner's request for an extension. ECF No. 72. In that Order, I included references to cases decided by this Court in which several Special Masters found varying lengths of time in excess of 42 days to be medically infeasible onset time frames for GBS following flu vaccination. *Id.* Petitioner's status report was due November 30, 2018. *Id*.

Petitioner did not file her status report on November 30, 2018; instead on December 4, 2018, Petitioner filed a second request for an extension of time to file her status report. ECF No. 73. In that Motion, Petitioner stated that her counsel had provided her with the relevant case law regarding the issue of onset and that they were scheduled "to speak yesterday about how [P]etitioner would like to proceed."[11] *Id*. Because Petitioner had several opportunities to consider her position since my Ruling on Onset in April of 2018 and had been unable to produce evidence supporting GBS onset 15 weeks and five days post-vaccination, I did not grant this request for an extension of time and instead issued an Order to Show Cause as to why her petition should not be dismissed. ECF No. 74.

Petitioner responded to the Order to Show Cause on January 3, 2019. ECF No. 75. Respondent replied on February 13, 2019. ECF No. 76.

I held a status conference with the parties on February 15, 2019. During that status conference, I informed Respondent that I wanted him to file an expert report addressing the feasibility of onset of GBS 15 weeks and five days after flu vaccine. Respondent submitted a report by Dr. J. Lindsay Whitton entitled "Review of the causes of GBS, with particular attention to influenza vaccines." Ex. A. (hereinafter "Whitton Rep."). Respondent filed Dr. Whitton's CV as Ex B.

On April 26, 2019, the parties each filed a status report indicating their agreement that I decide this case on the record. ECF Nos. 80, 81. Through informal communications on June 17, 2019, the parties were asked if they required an additional briefing schedule. Respondent replied

[11] Petitioner represents that she was scheduled to speak with counsel regarding the status report on December 3, 2018, which was three days after her most recent deadline. ECF No. 73.

that they did not intend to submit a brief. On June 30, 2019, Petitioner filed a status report, stating that she did not require a briefing schedule. ECF No. 82.

I issued a Decision Denying Entitlement on July 24, 2019. *See Kamppi v. Sec'y of Health & Human Servs.*, No. 15-1013, 2019 WL 5483161 (Fed. Cl. Spec. Mstr. Jul. 24, 2019). Judgment was entered on August 29, 2019. ECF No. 86. On February 2, 2020, Petitioner filed an application for attorneys' fees and costs, totaling $28,611.99. Counsel for Petitioner Lynsie Kamppi's Motion for Fees and Expenses (hereinafter "Fees Application" or "Fees App.") at 2, ECF No. 88. On March 9, 2020, Respondent filed a response stating, "[P]etitioner has not demonstrated that the claim was supported by a reasonable basis" and "therefore respectfully requests that [I] deny [P]etitioner's motion." Fees Resp. at 1, ECF No. 90. Petitioner filed a Reply on April 10, 2020 which reiterated many points previously addressed in support of entitlement. Fees Resp., ECF No. 92. This matter is now ripe for adjudication.

## III. Legal Standard

Under the Vaccine Act, an award of reasonable attorneys' fees and costs is presumed where a petition for compensation is granted. Where compensation is denied, or a petition is dismissed, as it was in this case, the special master must determine whether the petition was brought in good faith and whether the claim had a reasonable basis. § 15(e)(1).

### A. Good Faith

The good faith requirement is met through a subjective inquiry. *Di Roma v. Sec'y of Health & Human Servs.*, No. 90-3277V, 1993 WL 496981, at *1 (Fed. Cl. Spec. Mstr. Nov. 18, 1993). Such a requirement is a "subjective standard that focuses upon whether [P]etitioner honestly believed he had a legitimate claim for compensation." *Turner v. Sec'y of Health & Human Servs.*, No. 99-544V, 2007 WL 4410030, at *5 (Fed. Cl. Spec. Mstr. Nov. 30, 2007). Without evidence of bad faith, "petitioners are entitled to a presumption of good faith." *Grice v. Sec'y of Health & Human Servs.*, 36 Fed. Cl. 114, 121 (1996). Thus, so long as Petitioner had an honest belief that his claim could succeed, the good faith requirement is satisfied. *See Riley v. Sec'y of Health & Human Servs.*, No. 09-276V, 2011 WL 2036976, at *2 (Fed. Cl. Spec. Mstr. Apr. 29, 2011) (citing *Di Roma*, 1993 WL 496981, at *1); *Turner*, 2007 WL 4410030, at *5.

### B. Reasonable Basis

Unlike the good-faith inquiry, an analysis of reasonable basis requires more than just a petitioner's belief in his claim. *Turner*, 2007 WL 4410030, at *6-7. Instead, the claim must at least be supported by objective evidence -- medical records or medical opinion. *Sharp-Roundtree v. Sec'y of Health & Human Servs.*, No. 14-804V, 2015 WL 12600336, at *3 (Fed. Cl. Spec. Mstr. Nov. 3, 2015).

While the statute does not define the quantum of proof needed to establish reasonable basis, it is "something less than the preponderant evidence ultimately required to prevail on one's vaccine-injury claim." *Chuisano v. United States*, 116 Fed. Cl. 276, 283 (2014). The Court of Federal Claims affirmed in *Chuisano* that "[a]t the most basic level, a petitioner who submits no

evidence would not be found to have reasonable basis…." *Id.* at 286. The Court in *Chuisano* found that a petition which relies on temporal proximity and a petitioner's affidavit is not sufficient to establish reasonable basis. *Id.* at 290. *See also Turpin v. Sec'y Health & Human Servs.*, No. 99-564V, 2005 WL 1026714, *2 (Fed. Cl. Spec. Mstr. Feb. 10, 2005) (finding no reasonable basis when petitioner submitted an affidavit and no other records); *Brown v. Sec'y Health & Human Servs.*, No. 99-539V, 2005 WL 1026713, *2 (Fed. Cl. Spec. Mstr. Mar. 11, 2005) (finding no reasonable basis when petitioner presented only e-mails between her and her attorney). The Federal Circuit has affirmed that "more than a mere scintilla but less than a preponderance of proof could provide sufficient grounds for a special master to find reasonable basis." *Cottingham v. Sec'y of Health & Human Servs.*, No. 2019-1596, 971 F.3d 1337, 1346 (Fed. Cir. Aug. 19, 2020) (finding Petitioner submitted objective evidence supporting causation when she submitted medical records and a vaccine package insert).

Temporal proximity between vaccination and onset of symptoms is a necessary component in establishing causation in non-Table cases, but without more, temporal proximity alone "fails to establish a reasonable basis for a vaccine claim." *Chuisano*, 116 Fed. Cl. at 291.

The Federal Circuit has stated that reasonable basis "is an objective inquiry" and concluded that "counsel may not use [an] impending statute of limitations deadline to establish a reasonable basis for [appellant's] claim." *Simmons v. Sec'y of Health & Human Servs.*, 875 F.3d 632, 636 (Fed. Cir. 2017). Further, an impending statute of limitations should not even be one of several factors the special master considers in her reasonable basis analysis. "[T]he Federal Circuit forbade, altogether, the consideration of statutory limitations deadlines—and all conduct of counsel—in determining whether there was a reasonable basis for a claim." *Amankwaa v. Sec'y of Health & Human Servs.*, 138 Fed. Cl. 282, 289 (2018). Objective medical evidence, including medical records, can constitute evidence of causation supporting a reasonable basis. *Cottingham*, 971 F.3d at 1346.

"[I]n deciding reasonable basis the [s]pecial [m]aster needs to focus on the requirements for a petition under the Vaccine Act to determine if the elements have been asserted with sufficient evidence to make a feasible claim for recovery." *Santacroce v. Sec'y of Health & Human Servs.*, No. 15-555V, 2018 WL 405121, at *7 (Fed. Cl. Jan. 5, 2018). Special masters cannot award compensation "based on the claims of petitioner alone, unsubstantiated by medical records or by medical opinion." 42 U.S.C. § 300aa-13(a)(1). Special masters and judges of the Court of Federal Claims have interpreted this provision to mean that petitioners must submit medical records or expert medical opinion in support of causation-in-fact claims. *See Waterman v. Sec'y of Health & Human Servs.,* 123 Fed. Cl. 564, 574 (2015) (citing *Dickerson v. Sec'y of Health & Human Servs*., 35 Fed. Cl. 593, 599 (1996) (stating that medical opinion evidence is required to support an on-Table theory where medical records fail to establish a Table injury)).

When determining if a reasonable basis exists, many special masters and judges consider a myriad of factors. It is appropriate to analyze reasonable basis through a totality of the circumstances test that focuses on objective evidence. *Cottingham*, 971 F.3d at 1344. The factors to be considered may include "the factual basis of the claim, the medical and scientific support for the claim, the novelty of the vaccine, and the novelty of the theory of causation." *Amankwaa*, 138 Fed. Cl. at 289. This approach allows the special master to look at each application for attorneys'

fees and costs on a case-by-case basis. *Hamrick v. Sec'y of Health & Human Servs.*, No. 99-683V, 2007 WL 4793152, at *4 (Fed. Cl. Spec. Mstr. Nov. 19, 2007).

## IV. Parties' Arguments

Respondent argues that "Petitioner has failed to establish a reasonable basis for her claim, and is thus not entitled to an award of attorneys' fees and costs." Fees Resp. at 6. Respondent notes that a claim must "at a minimum, be supported by medical records or medical opinion." Fees Resp. at 7; *Everett v. Sec'y of Health & Hum. Servs.*, No. 91-1115V, 1992 WL 35863, at *2 (Cl. Ct. Spec. Mstr. Feb. 7, 1992). Respondent argues that although a hearing to determine onset was held, it was determined that onset of GBS occurred 15 weeks and five days after vaccination, which "put [P]etitioner on notice that she was likely proceeding without a reasonable basis." *Id.* at 8. Although Petitioner was given the opportunity to file an expert report, Petitioner was also aware that she was "proceeding at her own risk." *Id.*; *see generally* ECF Nos. 63, 70, 74. Respondent also claims that "the filings of Dr. Lyons-Weller's [sic] reports emphasize that after four years, and with countless extensions, [P]etitioner could not find an expert to opine on causation." Fees Resp. at 8.

Petitioner argues that when the Petition was filed, Ms. Kamppi stated, "Within a few weeks of receiving the flu vaccine" she experienced a wide variety of symptoms associated with her lower extremities and some numbness and tingling in her upper extremities. Ex. 1 at 1. Eventually, in mid-January, her symptoms required medical attention and that is when she received the diagnosis of GBS. Fees Reply at 6. A few of Petitioner's doctors noted in her medical records that her GBS might have been secondary to the flu vaccination that she received previously.[12] *See* Fees App. at 2, ECF No. 88. Petitioner filed affidavits that stated that Petitioner's symptoms began in October 2013, which was in the temporal window for the onset of GBS after a flu vaccination. Petitioner also filed two reports from Dr. Lyons-Weiler, and Respondent filed an expert report by Dr. Whitton regarding the feasibility of onset of GBS 15 weeks and five days post-vaccination. Petitioner argues that the filing of Dr. Whitton's expert report was necessary to resolving this case, thus Petitioner had reasonable basis until the issue of causation was resolved. Fees Reply at 8-9.

Petitioner argues that the factual issue of onset remained disputed until I issued a Decision on July 24, 2019, thus until that was decided, Petitioner had reasonable basis for filing her claim. Fees Reply at 8.

## V. Discussion

### A. Good Faith

Petitioners are entitled to a presumption of good faith. *See Grice*, 36 Fed. Cl. 114 at 121. Respondent does not challenge Petitioner's good faith. *See* Fees Resp. at 6, n. 6. Based on my own review of the case, I find that Petitioner acted in good faith when filing this petition.

### B. Reasonable Basis

[12] However, these notations also indicate that the physicians erroneously believed Petitioner received the vaccination seven weeks prior to her January 2014 hospitalization.

As noted above, the standard for establishing reasonable basis is lower than that required to prevail on a vaccine-injury claim. *Chuisano*, 116 Fed. Cl. 276 at 287. However, Petitioner is still required to provide *some* evidence that her injury was caused by the flu vaccination she received.

1. The Fact that I Ordered Respondent to file an Expert Report does not Establish Reasonable Basis

Petitioner argues that the filing of Dr. Whitton's expert report was necessary to resolving this case, thus Petitioner had reasonable basis until the issue of causation was resolved. Fees Reply at 8-9. However, the Federal Circuit has made it clear that the reasonable basis analysis centers around whether Petitioner has presented objective evidence supporting the petition. My request that Respondent submit an expert report is not objective evidence. Instead, the appropriate analysis must focus on whether the evidence Petitioner actually presented during the pendency of her claim constitutes objective evidence sufficient to meet her burden ("more than a mere scintilla but less than a preponderance of proof"). *Cottingham*, 971 F.3d at 1346. As discussed below, I find that it does not.

2. The Medical Records do not Establish Reasonable Basis

Petitioner's medical records surrounding her GBS diagnosis are clear, internally consistent, and complete. She received her vaccine on September 28, 2013 and presented to her primary care provider in November of 2013 with unrelated medical issues. There is no mention of numbness or tingling at that visit. Ex. 2 at 29. She spoke with nine different medical providers between November 2013 and January 2014. There is no reference in those records to onset of pain, numbness, or tingling that began in October or November of 2013 (as is articulated in the affidavits and the testimony at the onset hearing). Instead, each of those medical providers consistently documented that Petitioner began experiencing symptoms of GBS on January 15, 2014.[13] Based on these medical records, Petitioner began to experience onset of GBS on January 15, 2014, more than 15-and-one-half weeks after she received her flu vaccination.

While there are medical records which indicate that Petitioner's GBS might have been caused by the flu vaccination, it is clear that Petitioner's physicians erroneously believed that she

[13] *See* Ex. 2 at 29 (medical visit on November 19, 2013 where Petitioner does not mention symptoms of GBS); Ex 15 at 1 (urgent care visit on January 17, 2014 where Petitioner describes numbness, tingling and weakness in the legs with onset "2 days ago"); Ex. 3 at 15 (ER visit on January 17, 2014 which indicates that Petitioner developed left calf pain and numbness and tingling on January 15, 2014); Ex. 3 at 19 (neurology evaluation on January 18, 2014 which notes three day history of rapidly progressive ascending paresthesias and weakness); Ex. 3 at 40 (medical examination noting that Petitioner became sick on Wednesday (which was January 15, 2014)); Ex. 3 at 22 (medical visit with an anesthesiologist on January 19, 2014 noting sensory and motor loss to both extremities which "started several days ago."); Ex. 3 at 30 (January 21, 2014 record from an infectious disease physician who noted that Petitioner's numbness and progression of symptoms began last Wednesday); Ex. 3 at 34-35 (doctor who notes numbness and tingling that began on January 15); Ex. 4 at 1 (rehabilitation records which describe an initial episode of numbness and tingling on January 15, 2014).

received the flu vaccine seven weeks prior to symptom onset.[14] Because these opinions were based on an inaccurate premise, I do not find that they constitute evidence which establishes reasonable basis.

3. Petitioner's Affidavits/Testimony do not Establish a Reasonable Basis

Petitioner filed affidavits from herself, her husband, her mother, and two co-workers. Exs. 10-14. The testimony at the onset hearing was largely consistent with these affidavits. Neither the affidavits submitted in this case nor the testimony provide Petitioner with reasonable basis. Each affidavit stated that Petitioner began to experience numbness and tingling in her legs in the October 2013 timeframe, but no *objective* piece of evidence supports this assertion. In fact, all of the medical records contradict these claims.

Furthermore, Petitioner and her co-workers stated that Petitioner missed work in "late 2013" or "December 2013" because of her alleged symptoms, however Petitioner's work attendance records show that Petitioner did not miss any work during that period. *See* Ex. 12 at 1 ("[Petitioner] informed me that she was being reprimanded by her supervisor for missing too many days of work"), Ex. 13 at 1 ("I recall that Lynsie called off from work numerous times in late 2013"; "I recall Lynsie getting called into the office by her supervisor for the numerous absences she had accumulated in 2013"), Ex. 14 at 4 ("Also in November, I was becoming exceedingly fatigued. In fact, I was calling off work due to exhaustion and symptoms I was experiencing, especially those in my legs"); *contra* Ex. 16 at 30-32 (showing Petitioner missed no time from work from August 2013-December 2013).

In addition, the description of onset that is detailed in the affidavits and testimony is inconsistent with the medically recognized progression of GBS. GBS is an acute disease and does not take months to manifest. As Dr. Whitton stated in his report, "By definition, in GBS the maximum weakness occurs **within 4 weeks of onset**". Whitton Rep. at 2 (emphasis added). He went on to state that "[i]n practice, most GBS patients reach maximum weakness within 2 weeks of disease onset." *Id.* Four weeks from October 22, 2013 (the date Petitioner stated in her second affidavit that her symptoms began) is November 19, 2013. It is clear from the medical records that Petitioner's maximum weakness occurred nearly two months after this – in mid-January 2014.

Although the Federal Circuit's decision in *Cottingham* did not address whether affidavits standing alone could confer reasonable basis, I find that when they are wholly inconsistent with the medical records and other evidence filed on the issue of onset and with the medically recognized disease progression, as they are in this case, they do not provide Petitioner with a reasonable basis. Based on the records filed in this case, I do not find that Petitioner has submitted objective evidence to establish reasonable basis in support of her claim.

---

[14] *See* Ex. 3 at 19, 59, 68, 71, 78, 88 (medical history collected by Dr. Steven Simensky stating "32 yof h/o IBS with chronic diarrhea, gastroparesis, with flu shot 7 weeks ago…"); *id.* at 24 ("1) Guillain Barre Syndrome – 357.0: Clinical picture very consistent with this; ? secondary to influenza vaccine ~ 7 weeks ago" written by Dr. LeRoy Essig); *id.* at 62, 81 (("1) Guillain Barre Syndrome – 357.0: Clinical picture very consistent with this; ? secondary to influenza vaccine ~ 7 weeks ago" by Dr. Blake Conklin (same as Dr. LeRoy Essig)); *id.* at 91, 96 (Dr. Simensky's medical history copied by Dr. Emily Klatte); Ex. 4 at 41, 47, 104, 121, 124, 176, 365 ("Mrs. Kamppi had the flu shot 7 weeks ago," taken by Robert Hall).

3. Dr. Lyons-Weiler's Documents do not Establish a Reasonable Basis

a. Dr. Lyons-Weiler's Qualifications

Petitioner submitted two documents from Dr. James Lyons-Weiler. Exs. 21-22. No curriculum vitae was submitted for Dr. Lyons-Weiler, however, because he has provided an opinion in other cases before the Court, I am familiar with his credentials. Dr. Lyons-Weiler has a master's degree in Zoology and a Ph.D. in ecology, evolution, and conservation biology. Dr. Lyons-Weiler is not a medical doctor. *See A.S. v. Sec'y of Health & Human Servs.*, No. 16-551, 2019 WL 5098964 at *5 (Fed. Cl. Spec. Mstr. Aug. 27, 2019). In terms of Dr. Lyons-Weiler's educational background and experience, Chief Special Master Corcoran has found that Dr. Lyons-Weiler is unqualified to opine on vaccine causation. *See id.* at *11. In this same case, Chief Special Master Corcoran found that there was no reasonable basis for Petitioner to file the petition alleging that multiple vaccines caused Petitioner to develop neurologic neglect syndrome, expressive language disorder, unspecified disorders of the nervous system, and immune dysfunction, despite the fact that Petitioner filed expert reports from Dr. Lyons-Weiler. *A.S. v. Sec'y of Health & Human Servs.*, No. 16-551V, 2020 WL 549443 (Fed. Cl. Spec. Mstr. Jan. 3, 2020)

b. Substance of Dr. Lyons-Weiler's Documents

Dr. Lyons-Weiler stated that the studies regarding GBS onset are arbitrarily set, typically at six weeks, but can range from eight to ten weeks as well. Ex. 21 at 1. Dr. Lyons-Weiler further stated that because the National Vaccine Injury Compensation Program sets the onset window at six weeks, studies on onset of GBS only consider cases where onset is within six weeks, which lead to a "self-fulfilling, but still arbitrary, exclusion of cases with onset after six weeks based on circular reasoning." *Id.* Dr. Lyons-Weiler cited two pieces of literature. Neither piece of literature was filed.

Dr. Lyons-Weiler used data from the CDC (uncited) to state that there are approximately 0.035 GBS cases per 100,000 people per week in the United States. *Id.* Dr. Lyons-Weiler next cited a Canadian study that shows that there are 0.03 GBS cases per 100,000 people. *Id.* Based on the CDC numbers and the Canadian study, Dr. Lyons-Weiler concluded that the "'control' intervals in these studies overestimate the null hypothesis parameter value for non-vaccine related GBS incidence." *Id.* Second, Dr. Lyons-Weiler cited a case report of a 52-year old woman who developed GBS ten weeks after receiving a recombinant hepatitis B vaccine. *Id.* It is unclear to me how this case report relates to this case as the onset window was not similar and the case report also involved a different vaccine.

In Dr. Lyons-Weiler's second document, he stated, "there exists no scientific or medical criterion based on any data from any study or studies that support the notion that any cut-off, be it five, fifteen, or 52 weeks exists in the etiology of GBS following influenza vaccination." Ex. 22 at 1. He further stated, "This means cases of GBS happen past 15 and 5 weeks but are ASSUMED, not DETERMINED, to not be due to the vaccine, and my other analysis demonstrates that

assumption is not warranted because the late-period GBS rates are, in fact, higher than the population baseline." *Id.*

Dr. Lyons-Weiler's documents do not state that flu vaccine can cause GBS more than fifteen weeks later. Further, nothing in Dr. Lyons-Weiler's documents addresses how GBS can develop more than 15-and-one-half weeks after flu vaccine.

As I noted in the Decision Denying Entitlement, special masters have not granted entitlement to a Petitioner who developed GBS more than two months post-vaccination because it is not medically plausible for the immune response that is a central component of the autoimmune process resulting in GBS to take this long. *Kamppi v. Sec'y of Health & Human Servs.*, No. 15-1013, 2019 WL 5483161 at *11 (Fed. Cl. Spec. Mstr. Jul. 24, 2019). The white paper authored by Dr. Whitton addresses this point. Dr. Whitton discussed the results of the Langmuir et al. study. This study addressed, amongst others, the following questions: 1) the extent of the causal relationship between GBS and the 1976 swine influenza vaccine and 2) the periods of time following vaccination when the risk of developing GBS is increased. Whitton Rep. at 6. Dr. Whitton stated that the study results indicate that while there was an increased risk of GBS following vaccination, any detectable risk diminished after four weeks and returned to the baseline at six to eight weeks. *Id*. at 9-10. No increased risk of GBS, therefore, was observed after eight weeks. *Id*.

The onset of GBS in this case was *well outside* the two-month window where medical experts indicate there is a risk following vaccination, and as a result, where special masters have found that the flu vaccine can cause GBS. There must be some period of time between vaccination and onset of signs/symptoms that is *per se* too long in order for the petition to possess a reasonable basis. Under the circumstances of this case, I find that more than 15-and-one-half weeks constitutes a large enough temporal gap that it deprives the petition of reasonable basis.

## VI. Conclusion

Based on the foregoing, Petitioner's Motion for Attorneys' Fees and Costs is **DENIED**.

In the absence of a motion for review filed pursuant to RCFC Appendix B, the Clerk of the Court SHALL ENTER JUDGMENT in accordance with this decision.[15]

**IT IS SO ORDERED.**

**s/ Katherine E. Oler**
Katherine E. Oler
Special Master

[15] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by each party filing a notice renouncing the right to seek review.